Our next case for argument is 22-1461, Baxalta v. Genentech. Mr. Peterson? Thank you. Good morning. May it please the Court. The key issue in this appeal is whether the Supreme Court's decision in Amgen overruled this Court's decision in Watts. A reasonable jury could find that the hybridoma and screening process that enables the claims at issue is indistinguishable from the process found enabling in Watts. Before you get there, I know you want to talk about the facts of Watts and the analysis of what happened to that claim in Watts, but what about the Watts factors? Is it your view that the Supreme Court's opinion did not disturb our existing precedent applying the Watts factors in the context of enablement? Yes, Your Honor. That's certainly our view. We look at Amgen as a rather case-specific decision that affirmed this Court's reasoning. I'm sorry. When you said yes, Your Honor, did you mean yes, the Supreme Court's opinion did disturb our Watts factors? Oh, I apologize. No, our view is that the Supreme Court left the Watts factors in place and left this Court's enablement jurisprudence in place. Do you find it strange that the Supreme Court didn't mention Watts? Oddly enough, Amgen itself was... Supreme Court doesn't use the words undue experimentation at all? I did find that slightly odd. The only time they referred to our Court at all was in two cases where they said we're not exactly sure what the Federal Circuit thought it was saying, but we think whatever it was saying was okay? Do you think if Watts were in front of the Supreme Court today, it would survive? I believe it would. The Supreme Court did not hold that screening as a matter of law is undue experimentation. The Supreme Court did not hold that testing as a matter of law is undue experimentation. The Supreme Court held that the Amgen claims required undue experimentation to practice, and we certainly agree with that. This Court's decision in Amgen didn't see any inconsistency between the outcome in its case and the outcome of Watts. It noted that Watts involved different facts, a different record, and that the decision that the Amgen claims were not enabled was consistent with the earlier decision in Watts that those claims were. The facts of our case resemble Watts far more closely than Amgen. The Federal Circuit Amgen opinion, I believe, distinguished the claims in the Amgen case from, I guess, the arguments and analysis in the Watts case by pointing out that in Watts, there was no argument about the scale of experimentation that would have to be undertaken to do all the making and screening there. And so to that extent, the Watts case doesn't speak to that question. Whereas in Amgen, that argument, that line of attack against the claims was on the table, as it was in Wyeth, Edenics, Enzo, et cetera. And so for that reason, even though the outcome of Watts, of upholding those claims, it was different from all these other cases. That's the reason why you reached divergent outcomes. And what do you think about that? I think the specific line from Amgen to which you're referring is the statement that we stated that no evidence was presented by either party on how many hybridomas would be viewed by those in the art as requiring undue experimentation to screen. And that's the same on this record here. Genentech has not suggested that there's a certain number of hybridomas that would be viewed by those of skill in the art as requiring undue experimentation to screen. And we think Wands correctly described the art in this area. That the art, the experiment, is conducting the entire hybridoma and screening process to make an antibody with the desired characteristics. That experiment, Wands pointed out, succeeded every time the inventor there tried it. That experiment requiring routine experimentation that Wands recognized was routine. I guess what I'm trying to figure out is why would it be wrong to reconcile Wands with our more modern day case law by pointing out that Wands only looked to the question of whether this hybridoma making and screening process was something that was a repeatable, known, understandable process to do making and testing. And that's it. And that's the only line of inquiry that happened in Wands. Whereas all of our modern day cases were not just looking at whether the means of making new candidates was a known, possible, definite thing. But in addition, ask the extra question of whether the scale of that kind of work and the indeterminacy of knowing ahead of time which candidates would likely prove to be good versus duds. It is an angle of analysis that just never occurred in Wands. And that's why you can reconcile all these cases together even though the facts tend to look very similar. We would suggest reconciling them by pointing out that neither Wyeth, Idenix, Enzo, or Amgen involved any reliable, predictable process like the hybridoma and screening process in Wands. Those cases truly did involve trial and error with no way using routine technology to generate new embodiments. Well, I guess I don't understand. In Amgen, it seems like it was a known process. It's just that process as it was applied to the various antibodies would discover some that worked and some that didn't work. And that's what your process does as well. Each time you apply your screening process, you result in some that meet the two functionality limitations and some that don't. In fact, most don't. I think only 1.6% of those that get analyzed do meet the two sets of functional criteria. So I don't know how you're not in the same trial and error scenario. Well, what our expert explained, and this is appendix page 19-202-204, we attached it to our 28-J letter, is that the problem with the Amgen claims was the requirement that they bind to specific residues. That is very difficult to identify what residues an antibody binds to, and it's very difficult to find antibodies that bind to the particular 15 out of the nearly 700 residues at issue. This court explained that it was that binding limitation itself that was enough to require undue experimentation. Our expert testified that it was that particular requirement that made generating antibodies binding to specific residues so unpredictable in Amgen. What about the—go ahead. When are we going to talk about the elephant in the room? The elephant in the room is the size of the genus, in my judgment. The Supreme Court said the more you claim, the more you have to enable, right? Yes, Your Honor. The more vast your claim, the more species within the range of that claim you're going to have to enable. Yes, Your Honor. Clearly, the Supreme Court is saying, oh, Justice Gorsuch is sort of enamored of some of his phrases, but he says the more you claim, the more you have to enable, right? Doesn't that clearly ask—always bring in the question, what's the size of the genus? Yes, Your Honor, it does. How big is your genus? Focused and small. How many possible antibodies can fall in your genus? The number of possible antibodies that are claimed has not been quantified. To be clear, it was Genentech's burden of proof. I thought the lower court opinion said there were millions? Of candidates, not the number of actual antibodies claimed within the genus. He was discussing simply potential antibodies. Yes, potential antibodies. The way you've drawn your claim covers a whole range of potential antibodies, right? Some will bind to the protein, and some will have the desired functional effect. Some won't. Yes, Your Honor, and as we view the law of enablement— And the same was true in Amgen, wasn't it? That is correct. Okay, and the Supreme Court said in Amgen, well, you've spent a lot of time doing this, and you've come up with 11 or whatever the number was, and the Supreme Court is saying that's not enough. The key difference, though, Your Honor, is we see a— You were able to identify a very small number of species that meet the limitations of your claim out of a world range of many hundreds of thousands or millions that might possibly qualify, and the only way you can find out is by a known method of testing. Anybody who is skilled in the art knows how to produce the test. It does the person have the time and the interest. We don't— What are we supposed to do with a rule for enablement for this class of cases that says the more you claim, the more you have to enable? I would go back to first principles of enablement and say the question is whether the claims can be practiced by one of skill in the art without undue experimentation and to adhere to the holding of WANs and the Court's first decision in Amgen that routine screening can constitute— Well, you're viewing undue experimentation as meaning is the test to find out whether or not the one you're testing meets some additional limit complicated or difficult? Is it undue? Is it a hard thing to do? And that's a little bit what WANs was talking about with how hard is the test. Well, I would point you— But it's admitted in both Amgen and in your case that— I mean, I don't mean to deprecate the significance and the importance of a scientist, but I'm a history major, not a chemist. It's easy. The test, as you've pointed out, the test your people use is easy. I mean, skill in the art, they know how to do it. It's just that they aren't sure when they look at—they pick an antibody. They say, this antibody falls within the limitation of the claim. We want to know if it does—if it binds and it does the other thing. They run a simple test, and a few times when you ran it, you found them. But now there's a whole world of potential candidates, right, that may or may not meet the specific limitation of the claim. That's correct, and the best we can do is distinguish Amgen factually and look at the testimony of our expert who said that the process for identifying new embodiments in Amgen was more difficult and less certain than the process for identifying new embodiments as here and as of WANs. And I look at page 12 of the slip opinion in the Supreme Court's decision in Amgen. I'm talking about the incandescent lamp case, and it says that, had Sawyer and Mann disclosed a common quality to fibrous and textile substances that made them adapted, others would have known how to select among such materials to make an operable lamp. But we don't read the Supreme Court as saying that is the only way to teach others how to select among such operable materials. WANs holds that routine screening can be a way of teaching skilled artisans of how to select among new operable embodiments. We believe that our process involves routine screening as in WANs and not the sort of trial-and-error painstaking experimentation required by Amgen. Your case turns on the difference of the testing method? Yes, Your Honor, it does, and this court emphasized in Amgen that facts matter and the standard... So undue experimentation only deals with the complications of the testing methodology? The certainty, the reliability, the difficulty, all of these are important factors for whether experimentation is undue. And the facts of our case and the testing required resemble WANs far more closely. Why is your testing methodology materially different than that, the one that was in the Supreme Court case in Amgen? It is because of the unpredictability in finding antibodies that actually bind to the specific 15 claimed binding sites, and it relates to the difficulty in actually identifying to which binding sites an antibody binds. Our process is essentially indistinguishable from the hybridoma and screening of WANs. Amgen says you can't simply screen, you have to, after going through the assay, proceed to identify what particular residues these antibodies bind to, which is difficult to do, and then, fingers crossed, hope that you find them. We accept that Amgen was trial-and-error. I guess I want to follow what you're saying, but I'm having a little trouble. Are you focusing on the screening process itself and saying that application of the screening process in Amgen, every time it was used, took way longer and was way more complicated than the one here in this case, and that there's evidence in this record to show that? The process, not the likelihood of identifying, not the results of the process, the screening process itself. Your Honor, our expert spoke to this. It's paragraph 254, appendix pages 202 to 203, talking about the different processes that need to be followed in Amgen compared to this case. It's attached to our Rule 28J letter discussing the Amgen decision, and he also notes the difficulty in identifying the particular region on PCSK9 to which the antibodies bound. But what about the difficulty of determining whether a given candidate in your situation has the desired pro-coagulant activity? Your Honor, that's accomplished simply by using the hybrid omen screening process that Wands recognized was routine. I thought you had to come up with some newfangled scheme in order to figure out whether a given candidate has the desired pro-coagulant activity. That's true. Our inventors taught modifications to a commercially available chromogenic assay process, but those modifications change it from minutes to hours. They don't materially increase the experimentation involved in the chromogenic assay process, viewing the facts and drawing all inferences in the light most favorable to Vax-Alta. I still don't understand your answer to the question of what it means when the Supreme Court says the more you claim, the more you have to enable. And that clearly, in my mind, deals with the breadth of the claim, i.e., the size of the genus. Your Honor, I'll just say the evidence here is that the actual claimed genus is focused and small. That's appendix page 16417. How can you even say that, though? We have no idea. We literally have no idea. Your position is that every time you run one of these massive screens, you're going to come up with a few working candidates, every single time. I mean, that just means you have an ever-expanding, limitless scope of the genus, because every single time you're going to find a few more. Every single time you're going to find a few more. And nobody knows when you're going to actually exhaust the entire constellation of possible candidates, which, as we all know, runs at least into the millions. That's true. The Supreme Court did make clear in Amgen, though, that the time and effort required to exhaust a genus is not the test for enablement. It's not alone the test, but what is very, very helpful for the patent owner who wants the kingdom of all compounds that work is when you have, you know, ex ante some understanding of some common quality of all the working compounds or antibodies. And in that instance, there wasn't any kind of ex ante understanding. And likewise here, we don't have any ahead-of-time appreciation of some kind of structural feature or something else that's going to run through the entire line of working compounds. That's certainly true. That was also equally true in Wands and its predecessor, Hybritech. What was your page, 16? 16417. Well, I've got the question. In your joint appendix, a number of things are marked as confidential, and yet those things are referred to in the brief not being marked as confidential. Are we bound in the record by the confidentiality markings? Your Honor. We're going to write an opinion? I mean, for example, on page 47 of your brief, you refer to Dr. Marosco and his deposition, and none of the brief matter is marked as confidential. Nothing from the district court opinion is marked as confidential, and yet you have in your appendix a bunch of stuff marked as confidential. And here at page 47, you're citing those things in the blue brief without being marked as confidential. My question is, can we write an opinion that refers to something that's marked as confidential in the appendix without worrying about it? Your Honor, I apologize. I need to consult with my client trial counsel on that. Certainly anything discussed in the briefing and by the district court. Well, if it's written in the brief or it's written in the district court opinion, you didn't mark that as confidential, then we're not going to rely on what's in the brief. But under our new rules now, there's a big burden on the court in writing an opinion to try to respect your marking of confidential in the record. And it's hard for me to know. It doesn't seem to me it should be the court's job to have to go through your blue brief and go back and look at every single page to see what was marked with yellow. Certainly, Your Honor. I'll confer with my opposing counsel, and we'll see what we can do in that regard. All right. Let's hear from your opposing counsel, please. Thank you. Good morning, Your Honors, and may it please the Court. Judge Chen, I want to pick up with the last thing that Your Honor asked about something disclosed ex ante in the patent that would allow a skilled artisan to determine what is in the genus and what is not without having to make and screen or conduct the research assignment that the Supreme Court now has given us as the standard for what is and what is not acceptable. It is undisputed on this motion that the patent does not disclose a structure that differentiates those antibodies that bind factor 9A and increase its procoagulant activity from those that do not, what Your Honor referred to as the good ones and the duds. There is no structure. There is also no mechanism of action disclosed. One doesn't know why the ones that work do work. What about the size of the genus? Absolutely, Judge Covinger. The size of the genus is, I believe Judge Chen is right, unknowable. What we all agree on is that there is some vast number of antibodies. I'm looking at the testimony that is marked as confidential, but it is no longer confidential. Your Honor, I'm saying that the genus is actually pretty small. It's focused in small, not unusually large. Yes, Your Honor. What Dr. Moresco is referring to, and that is their confidentiality. I have no objection to the court relying on it, but that's their witness. Well, they've waived it off now. Understood, Your Honor. What Dr. Moresco is saying is that, ultimately, there are not very many antibodies in the genus. He agrees that you have to start by screening a vast process. There are not many antibodies that actually meet the limitations of the claim? Correct. What he is saying is that the number of antibodies. His genus is the genus of the ones that actually meet the limitation. That's correct, Your Honor. And the argument that they are making is, yes, you would have to screen a very, very large number of candidates, but you would ultimately find that there are not many of them. That's exactly the argument that this court in eidetics rejected as backwards. The work done to screen to find those antibodies is the undue experimentation, that it turns out that there are not many of them. Should the work done, which is what you said is the undue experimentation, should it matter how hard it is to do that work, how long it takes, how complicated? Let me give you, for example, suppose a supercomputer could run all of the testing on a million antibodies in 1.7 minutes, and we would now know the complete universe of that genus. Would that be undue experimentation just because it had to analyze millions of samples to determine the 1.6% that fall within the claims? I think the answer may be yes after the Supreme Court's decision in Amgen. I think that law is going to have to be developed. That's really scary for me. That's a really scary proposition. I mean, then you're saying undue hardship isn't a thing anymore. Well, and to be clear, Your Honor, on the facts of this case, Your Honor's hypothetical hasn't come yet. We don't have computers that can do that. I think in this instance a lab person has to actually do it. But I don't want to avoid the question. The Supreme Court seems to be saying, and I think this is consistent with what this Court has always said, the patent has to teach you how to make the invention, not how to make things that aren't the invention and sift to find the things that are. That distinction may matter. But just to follow up on what the Chief is asking, the Supreme Court's opinion does seem to acknowledge there's more going on here than just looking at the scale of the make and screening and wants to know about the nature of the invention and the state of the art. And maybe the state of the art here is that the testing goes super fast, goes really easy. And so, therefore, it becomes so conventional and minor and such a modest act that, therefore, it couldn't possibly be considered undue experimentation if the amount of time to undertake testing all the millions of candidates would only require a week or a day or something like that. I think that the law is going to have to evolve in that direction. I take Your Honor's point. On this factual record, however, what Bexalta's scientists recommend to the skilled artisan is exactly what Amgen's did and which the Supreme Court rejected by saying, calling on scientists to create a wide range of candidate antibodies and then screen each to see which happens to meet the claim limitations is a research assignment. It is not enablement. Is there evidence in this record about how long that screening process would take or how easy it is to perform, how routine, how much time it would take to go through these millions of things? There is evidence that the actual screening, and we've never contended otherwise, the actual screening process making a hybridoma, which was at issue in WANDS by the time of the priority date in this patent, is routine, absolutely. Screening the antibodies. But routine. It's also routine for me to make lasagna, but it takes me two days. Fair enough, Your Honor. So the point I'm trying to get at is I'm trying to figure out what is still on the table after Amgen for WANDS in the form of undue experimentation. What are the things that one might look at to assess whether there's undue experimentation in a case, even though that case involves starting with a large genus in order to narrow it to a functional genus? I think it's the inability, presumably if it could be done that quickly, one would come out in the patent with something that unites the successful candidates. And I think what the Supreme Court is saying is if the only thing you know from doing your own work is that there is gold in them there hills and you tell people that they can go find it, it doesn't matter how easy it is to find it. That's not enablement. I think what the court is telling us is that the ease by which one can find it may very well lead to a patent that tells you what it is you're looking for before you go screening it, but that an instruction to go screen and find it yourself is no longer enablement. That's a research assignment. What is enablement? If you were writing the test, what would it take to enable a broad genus claim? I think that there would have to be some form of uniting structure that maps. You think it has to be structure-based as a common quality? And aren't you just saying the genus has to be narrower? I don't think I'm saying it has to be narrower. What happens if you add these other limitations? What are you doing? Aren't you shrinking the size of the genus? I think the genus, to take this in one place, the genus of lasagnas all have pasta in them. If it doesn't have pasta, I don't care what the menu says. That's not a lasagna. That's a structure that unites the genus. There could be lots of them, but they have a common structure. Is structure the only way? I don't know the answer to that question, and the Supreme Court says, for example, when it introduces structure, I think it is telling us that structure is not the only way. But I think the point of the Sawyer— It can't possibly be the only way, or you've just said there could be no functional claiming for genuses. Because not every genus is going to have what is apparent to any skilled artisan and necessarily common structural component. I agree with that, Your Honor, and I don't think structure can be the only way. And I don't know how you can have a genus of antibodies that are defined only by what they do at this point, without any structural limitation. I think that's a difficult question. I think this case doesn't present that difficult question, because it is squarely on point with the facts of Amgen. But I think Your Honor is right. There has to be more than merely structure that unites the genus. But to answer the breadth of the genus, if you look at claims 6, 8, and 10 of this patent, which are not asserted, but they are certainly in the patent, those are genus claims to antibodies, in which the antibody or the antibody fragment has the variable region of one of their three antibodies. You can take 193AD3, which is a murine antibody, take the binding region, the part that matters, and put it into a camel antibody or a humanized antibody or a chimeric antibody. That's a broad genus. But the reason that you know in advance that that genus will work is because the patent tells you that the part that matters works. And so a skilled artisan reading the patent can differentiate in advance. So you think those claims are enabled? I think those claims are... Because, you know, putting it into that one variable region into all these different formats, you think there's enough confidence that it's going to work in all those different formats? I don't think summary judgment of no enablement would enter in that claim. I think the person you asserted that claim against would have an expert who would come in and say camels are different and this is different and it might be a tribal issue of fact. But I don't think that you could get summary judgment that that claim is not enabled. I think there would be a fact dispute. Right. But I guess getting to just moving forward, we have to always worry about what's around the corner for the system. Are we really left in an all or nothing proposition? Or there is no all proposition anymore. Now it's just we're reduced down to just the one very sequence that you figured out accomplishes the binding and then also gets you the desired coagulant activity in this case? I don't think that's necessarily true, Your Honor. Imagine, for example, if it had turned out that all of Bexalta's antibodies that succeed have two leucines followed by an arginine followed by a serine. Let's assume that's not the way the science works, that there is something quite random about the ultimate physical sequence that makes things work versus not work. Then I think where that would take the court, if anywhere, is to revisiting the overruling of Noel. It is the thing that we need to look at, the target, not the antibodies. But where the law exists right now, I don't think you can claim all the antibodies that have a particular functional outcome. I think that's what this Court said in Amgen faces high hurdles. And I think what the Supreme Court is saying is that's a research assignment. I think you do need something more than that. I'm not smart enough to know whether there could be something that isn't structured. I see how you can do it with structure. But I do see from the Supreme Court... Some people talk about using means plus function claims. Sure. Do you think that makes sense here? I think that might very well devolve down into being limited to the individual means that are in your patent. That might be just another way of getting a claim to the 26 antibodies. Right, but then there would be some knife fight over what is the structural equivalent of that. I think that's right, Your Honor. And I think that might be one way of doing it. I think that that takes you to the same place, I think, as a doctrine of equivalence fight around the antibody sequence itself. But I think means plus function is certainly one way that people are going to start trying to solve this riddle. What Amgen makes very clear you cannot do, however, is solve it the way Bexalta did, which is, I found 11 antibodies that work. I don't know why they work. But I know that you will find more if you make more. And if you do, I own them. That is no longer, and I don't believe that was cognizable after identics or Wyeth or Enzo or Amgen in this court. But it certainly isn't. I don't remember if we asked you the question, do you think the Supreme Court opinion disturbed any of the Federal Circuit preexisting case law on scope of enablement and WANs factors? I don't think it did. I think, granted, it doesn't mention WANs, and I certainly have the same curiosity that everyone else does of why is that. But I think that the things that the WANs factors are getting at are part of what the Supreme Court is getting at as well. And to Judge Clevenger's point, there are the places where the Supreme Court takes on some of Amgen's characterizations of this court's jurisprudence and says, we don't know that that's what the jurisprudence said, but we agree with you that if it did, it would be wrong. But I don't see anything in it that is saying the law was fundamentally wrong. I do think, however, that under the law as it existed before, the Supreme Court decision, this case was a fortiori from Amgen not enabled. And I just want to make sure I say two things. The testimony of their expert, and I'm quoting from A17341, apart from trial and error, nothing in the patent will tell a person of ordinary skill what other different antibodies and fragments would exhibit the factor VIII-like activity shown by these ones. That's undisputed on summary judgment and under this court's precedent even before Amgen. That's insufficient. And the second is that there is a debate in the... And this may be a place in which I think the Supreme Court clarified the law as opposed to changed it. There's a debate in the briefing about whether it matters that the patent claims antibodies that increase the procoagulant activity not only by a little bit like the ones in the patent, but by much more than that, up to factor VIII's level of activity. The Supreme Court answered that question not only in the broader the monopoly it demands, the more one must enable, which it says three times, but also in this passage. If a patent claims an entire class of compositions of matter, the patent specification must enable a person skilled in the art to make and use the entire class. There's no dispute between us that antibodies that increase the procoagulant activity of factor IX by as much as factor VIII do are within the scope of the claim. If they are covered by the claim, they have to be enabled, and there is no dispute that they are not enabled. How do the WANs factors continue to exist, or how do you perceive them to operate in light of the sentence in the Supreme Court's Amgen that says, while we agree with Amgen that enablement is not measured against the cumulative time and effort it takes to make every embodiment within a claim? Because, Your Honor, I believe that the point that Amgen was making there is that the question was how long would it take me to make every single one cumulatively? How long would it take me to, for example, sing all of the Beatles songs? And what the Supreme Court is saying is that, and I don't think the Federal Circuit, there was a debate in Amgen about whether this Court had ever said that, and the dissent from denial of panel re-hearing says no. It's just undue experimentation. I've always understood it to include an assessment of how much work it would take a skilled artisan to do. Am I wrong? No, you're not wrong about that, but I don't think the Supreme Court is disagreeing with that. What it is saying is how long would it take to make every single one of them cumulatively is not the test, and I don't think there's anything inconsistent with saying the test is not how long will it take to make all of them. The test is how long will it take to make each of them, how much work goes into making the full range of them. Maybe what it's trying to say is if there was a known common structural quality that runs through the good candidates, then even if it takes you a super long time to test all those good candidates with the common structural feature, that's okay because you've pre-identified at least one feature of what is the good from the bad. I think that's exactly right, and that's its discussion of some sands might not work in one of the prior cases about making clay. There may be individual sands that don't work, but the patent taught you how to make the clay. I think that's exactly right, Your Honor. I see that I'm over my time. No, you need to answer for Wands, because the other side, the big thrust of their case here, is that the facts here, the hybridomas, that kind of testing and screening was blessed, endorsed in Wands, and why can't it likewise be this case here, and that's factually the key distinction between whatever making and screening is going on here versus all these other cases, Amgen, Enso, Identis, Wyeth, et cetera. I'm happy to do that, Your Honor. I appreciate the time. The Wands case was asking the question whether hybridoma technology at the time was undue. Cohen and Milstein had gotten the Nobel Prize for it 12 or 13 years earlier, and the answer there was factually no, it's not. Wands was not claiming the antibodies. Wands was claiming using the antibodies in the sandwich assay. Wands was not trying to exercise dominion over the full range of IgM antibodies that bind hepatitis cell surface protein. It was answering factually a very different question. That is why when you get to later cases that are talking about, I own the antibodies themselves. If there are antibodies out there and you make them, they're mine. That is a different question factually than what was being presented in Wands, and then there is the point Your Honor made earlier that none of the debate in Wands was really about how hard is it or how long would it be. The debate in Wands is really about mathematically how well did Wands do. Is it 44%, which this Court said is a reasonable percentage, or did the Board miscalculate the 2.8%? Wands is not really asking the question that any of the subsequent cases ask, and I think that it's impossible to square the facts of this case with ENSO, Wyeth, IDENIX, and Amgen itself and come out in favor of Bexalta. Okay, well, just to be very precise, because I'm just trying to figure out what to do with Wands or in what way, shape, or form it continues to have meaning following Amgen, and there are the Wands factors discussed in Wands. Yes. Quantity of experimentation necessary. Do you think that factor has been eliminated by the Supreme Court in Amgen? No, Your Honor, I don't. So how would the quantity of experimentation necessary... You're saying if there were, like, two or three tests that could identify the entire genus, like, if it wasn't going to take a million different attempts, it would be enough? How would you suggest, as applicable to this case, you measure the quantity of experimentation necessary? I think you're exactly right, Your Honor. I think that, and in some ways, it's the point that Judge Chen is making. Even if you had a common structural feature or some other thing that you knew a priori united the members of the genus, you might still ask, how hard would it be, how much experimentation is needed, to then go find them? And you could imagine a patent that tells you something where the experimentation would still be undue. I think that factor survives. I don't think anything in... So my problem is your predicate. Your predicate is still, and I see where you're coming from with it, but your predicate is that there has to be some common structural feature, and I just don't think that the Supreme Court meant in Amgen to eliminate the possibility of functionally claimed genuses. And that's why they said, for example, with regard to structure. So I feel like there has to be other stuff, but I'm having a tough time wrapping my head around or identifying what that other stuff is. I agree with you, Your Honor, and I apologize. I did not mean to say structure is the only way. I think what... If you look at the lock analogy in this Supreme Court case, I think it perfectly summarizes what the Court is saying. You have a lock with 100 tumblers, each with 20 positions. The patentee finds 26 that work and says, go find the rest of them. I know they're out there. And the Court says, quote, sure enough, that would produce functional combinations. You could spin the tumblers and you could find more of them, but it wouldn't enable others to make and use functional combinations. Why are those two things different? Because what the Court is telling us is that the patent has to enable you to make the ones that work, not to trial and error and hunt and peck to find the ones that work. Structure might be one way of doing that. There might be other ways of doing it. I'm in no way negating that. But I think that the amount of work you would need to do to find the combinations that open the lock, all of the things in the ones factor, state of the prior art, skilled artisans, working examples, those all still matter. Okay. Enablement requires you to teach them to make the ones that work? To make the invention. If the invention is the antibodies that work, it has to enable a skilled artisan to make... And hasn't your adversary done that? Uh... Has he made 14 or whatever? He made 11, and he's entitled to patent those. And, in fact, he did patent three of them. What he can't patent is the other ones that exist out there that someone else has to first make without identifying what they are. We have no dispute that they could patent their 11 antibodies. And they could also patent, if it were novel, the screening techniques to identify the other antibodies. Absolutely, Your Honor. You just said that in order to claim his entire genus, he has to have made them all. Or he has to have... I apologize, Your Honor. Isn't that what you said? You can only claim the ones that he made? I did not mean to say that, Your Honor. He can claim the ones he made. The Supreme Court leaves open the idea that if the patent teaches the reader which are the other ones that will work, not how to find them, but which are they, you can claim that as well. The reason that Sawyer and Mann... If the claim has narrowed itself to a different class, species, so all it's done is shrink the size of the genus. I think it may be the case that vast, broad, functional genera are not possible after Amgen, but I don't think they were possible after Amgen in this Court, or Wyeth or Identix or Enzo either. I don't think that's new, but I do think it's clear. Okay. Thank you very much. Well, we went over by quite a bit, so you definitely have some extra time. Thank you, Your Honor. First, I think my friend misspoke with respect to the Wands case as involving only method claims or for the assays. You'll note claims 19 and 25 through 27 on the application are in Wands for the monoclonal IgM antibodies themselves. Claim 7 in the issued patent begins monoclonal high affinity IgM antibodies. Wands was not simply claiming the assays. Wands was claiming the particular antibodies. Chief Judge Moore, the Supreme Court had every opportunity in Amgen to hold... I guess in Wands, the opinion, it shows the method claim, right? I mean, it copies in the method claim in there. How do we know that it's also analyzing something else beyond the method claim? Your Honor, the concluding paragraph refers to all of Wands' claims. All of Wands' claims were issued, and it's my understanding that all of Wands' claims, including the antibody claims, had been held invalid for lack of enablement. So all of those were reversed, even though it was specifically the opinion. But the Supreme Court had every opportunity in Amgen to hold that functional genus claims of antibodies are simply impermissible. The Supreme Court had every opportunity in Amgen to hold that screening is, as a matter of law, non-enablement, to hold that you must always identify... No, but the Supreme Court hates clear black letter rules in patent law, and it won't give them to us. But then it writes an opinion in which there's no other way to come out. 101 is a prime example. What diagnostic method claim has been found to be patent eligible post Mayo and all of that? Zero. But nowhere in the Supreme Court does it say diagnostic method claims are off the table. Why isn't it similar here? Yeah, they didn't say, and possibly it's because they know enough to know they don't know everything, especially in this dense technology. And perhaps someone can identify something other than structure that is a common feature to them that might allow someone to identify them. But I don't see post-Amgen how you can functionally claim a broad genus unless there's some common thing that you can point to with regard to it. I look at page 17 of the opinion, where the Supreme Court, I think, is making clear that it's writing a narrow opinion on the facts of the case. Where are they making it clear they're writing a narrow opinion? Boy, it doesn't read that way to me. Whether methods like a roadmap or conservative substitution might suffice to enable other claims and other patents, perhaps because, as this court suggested in Incandescent Lamp, the inventor identifies a quality common to every functional embodiment. They do not here. They leave a scientist about where Sawyer and Mann left Edison, forced to engage in painstaking experimentation to see what works. And if you remove the word, perhaps, from that sentence in the em dashes, I think the opinion reads very differently. But the Supreme Court made clear it was reaching a holding on the facts of the case that were in this court in its Amgen decision didn't see any inconsistency between its outcome on the facts of Amgen and the facts of Wands. We agree. We don't see any inconsistency between the Supreme Court's decision in Amgen and the outcome on the facts of Wands and Hybritech. And I would add another perhaps. But I'm having trouble seeing any daylight between your facts and Amgen. And the difference, I think, is the painstaking experimentation What was the painstaking experimentation in Amgen? Judge Justice Gorsuch being his clever self. That wasn't. What's the painstaking experimentation in Amgen? It is identifying the binding sites for the antibodies which is technologically more difficult, I think everyone would agree, than identifying the pro-coagulant activity at issue here and creates greater unpredictability in terms of whether they will be found. And that, in our mind, is what responds when you follow a routine process each time you create new embodiments within the scope of the claims. I agree with my friend that the relevant question is the work and the experimentation required. The painstaking experimentation that Justice Gorsuch points to doesn't seem to be the amount of difficulty of each stage of the screening process but rather the trial and error that must occur by the genus to figure out what is in the claimed functional genus. Hunting license, he goes on and on. All of his analogies are about the number of things you have to sort through to get to the genus that will fit the functional description. It doesn't seem to me, and where do you see in here that he is discussing, wow, in Amgen, boy this screening method is really hard and that's what matters. I think you see and we quoted, I believe, Sanofi's discussing the level of experimentation and the fact that it was a trial and error process. And so are you. But I would say I like the Locke analogy because I think the Locke accurately describes identics, Wyeth, Enzo, and Amgen. In those cases you truly were testing combination by combination, fingers crossed, I hope I find something that works. What I would say is our claims like Juan's, knock three times on the side of the safe and it is going to spin to a new combination that will open it. Do you know in advance what that new combination is going to be? No. But can you go through a very simple process? All of them. And you're going to have to go through that process over and over and over again a million or so times in order to identify the ones that work. That's exactly trial and error. You identified all of them. So it's not a matter of does our process get you to one that will fit within the... Does our process without undue experimentation or have we articulated a way without undue experimentation to get you all of them, the full scope of the claim? I recognize them over time, I'll simply say that. Answer please. And that's not how we view undue experimentation in light of Amgen, that it's not about identifying the full scope of the genus, but it is about the level of experimentation required to create new embodiments. I don't want to find that your claims are not enabled, but I don't see daylight between your case and Amgen. Doesn't the would-be infringer have to search the entire genus or a big part of it to find out whether the one they want to use is going to infringe? No, Your Honor. How does somebody decide whether or not their particular product is going to infringe your claim? Well, if they... Your Honor, if a would-be would simply follow the hybridoma and screening process taught, and within a short period of time, crediting the testimony of our experts, would have a new embodiment within the scope... Somebody just comes in their lab and says, here's this antibody, and we think maybe we ought to build it into something to know whether or not it's going to bind and have the effect that your claims require. They have to test it, right? You're a competitor, right? If you wanted to design a product, design a round, and you didn't want to get your claimed species that lies within your broad genus, how does the competitor know whether it's safe? So, as a competitor, I would first have to be, I assume, finding antibodies that bind to factor 9, 9A. Once I have created antibodies that bind to factor 9, 9A, then the question would be whether they also result in procoagulant activity. You can determine that through screening. You're not going to just stumble across an antibody that binds to factor 9, 9A by accident. These are created through the hybridoma process. But you'd have to do that, just the way you did it, to prove the ones that met the limitations of the claim, right? Yes, Your Honor, that's correct. You would verify that antibody in those circumstances through the screening process. You wouldn't be... The defendant's antibody, did they, do you know if they used the hybridoma process? I mean, their antibody is very different looking than your discovered antibody. They followed slightly different steps, so they... They took 10 men, 10 years. 100 man years. 100 years. It's not like you go through the standard garden variety hybridoma process and out pops their... I don't know even how to pronounce it, but their antibody. I think we discussed this on page 19 of our opening brief. What they did was first generated hybridomas making the monospecific antibodies against factor 9, 9A, then come... I'm sorry, factor 9A and factor 10. They then combined those together into a bispecific antibody, then screened for procoagulant activity. So rather than beginning with the factor 9, 9A arm, screening it for procoagulant activity, and then combining it to create a bispecific antibody, our understanding is they were creating the bispecific antibodies first, followed by screening them for procoagulant. Okay, well we are way over. I'm sure this is going to fall flat, but I'm going to try channeling my punster colleague and say, boy, this case is requiring undue experimentation on our part. Thank you. Thank you.